Margaret Lyons, as the administratrix of the estate of Kenneth Cook, deceased, appeals from a judgment in favor of the defendants, Walker Regional Medical Center, Inc., and Laurie Hunter, in the medical-malpractice action she brought against Walker Regional and Hunter (Walker Regional and Hunter are hereinafter referred to collectively as "the defendants"). Lyons had brought an earlier appeal in the case, following a summary judgment in favor of the defendants; this Court reversed the summary judgment and remanded the case. Lyons v. WalkerReg'l Med. Ctr., 791 So.2d 937 (Ala. 2000) (hereinafter "Lyons I"). In that opinion, this Court quoted the following details concerning the events underlying the litigation from the trial judge's "Memorandum Opinion and Order," entered when he had initially denied the defendants' motion for a summary judgment:
 "`On May 7, 1994, Kenneth Cook was a detainee at the Walker County Jail. On that day, he was taken to Walker County Regional Hospital where he complained of pain in his lower abdomen, nausea and vomiting blood for two weeks. *Page 1073 
 "`At 4:00 p.m., Kenneth Cook's vital signs were taken by Deborah Evans, a registered nurse, employed by Walker Regional Medical Center. Deborah Evans did not usually work in the emergency room. She had only worked in the Emergency Room on a few occasions prior to May 7, 1994. The hospital policy required that triage nurses have two years of ER experience.
 "`On May 7, 1994, Deborah Evans' emergency room duties as triage nurse included placing patients in beds, taking the initial assessments, initial vital signs, and ordering initial lab work. Evans took Kenneth Cook's blood pressure, pulse, temperature, and respiration. His blood pressure was 159/106. According to Ms. Evans, Kenneth Cook's pulse was a little fast and his blood pressure was higher than normal.
 "`Evans drew blood for a CBC at 4:15 p.m. She did not know what to do when the results came back nor did she know what the procedure was as far as placing the results in the chart. She knew that sometimes they have baskets where charts are placed pending lab results. When the results come back, they are placed with the chart and put in the basket for the doctor to see.
 "`The CBC results were reported at 5:37 p.m. They showed a slightly elevated white blood cell count, which indicated a possible infection. These results were written onto the front page of Cook's chart. Evans was not the person who obtained the CBC results, and Evans testified that she never knew the results of the CBC. After the CBC was ordered, Evans turned the treatment of Kenneth Cook over to Hunter.
 "`On May 7, 1994, Deb Williams was scheduled to work as a Data Terminal Operator (hereinafter DTO), but she called in sick. Therefore, until Rochelle Harris arrived at a little before six o'clock, Laurie Hunter had to act as RN, Charge Nurse, and DTO.
 "`According to the lab results, the blood for the electrolytes, PT and PTT was collected at 5:26 p.m. On the front sheet, there is a notation in the lab ordered/collected section that at 5:08 LH ordered the electrolytes, PT and PTT.
 "`Laurie Hunter testified that she did not order that the electrolytes, PT and PTT specimen be collected. Hunter does not have personal knowledge as to who ordered this particular lab work, but normally a physician in the emergency room department orders the lab work. Hunter also testified that under the hospital's standard protocols . . . there are occasions where nurses order lab work, but she does not know if electrolytes are covered under these protocols. Moreover, Dr. Marshall Boone testified that he never ordered the electrolytes, PT and PTT; in fact, he reviewed Cook's medical records and observed that these tests were ordered before he saw Cook at 5:45 p.m.
 "`Laurie Hunter does not remember whether she put the electrolytes into the lab, but she admitted that since she was a DTO until Rochelle arrived that would have been her responsibility. Hunter also admitted that she knew that the electrolytes, PT and PTT had been ordered, but she never bothered to check to see if the results had been received.
 "`According to laboratory results concerning Kenneth Cook, an initial result on the electrolytes, PT and PTT was reported at 5:43, and these results warned that more results for this specimen were pending. These laboratory results were placed on the front page of Cook's chart.
 "`At 5:45 p.m., Dr. Marshall Boone saw Kenneth Cook for an assessment. *Page 1074 
When a person complains about gastrointestinal hemorrhage, he has to be evaluated to determine whether he has blood in his stomach. Dr. Boone ordered a nasogastric tube to be used to check for blood in Cook's stomach. This test required a painful process wherein the tube is inserted down the patient's esophagus into his stomach. Deborah Evans tried to insert this tube, but Kenneth Cook complained that the procedure was hurting him. Evans informed Laurie Hunter that Cook did not want her to insert the tube. Ms. Hunter said that she would attempt to insert the tube. Ms. Hunter explained the procedure to Cook and why it was necessary. Nevertheless, Cook continued to refuse to have the tube inserted. Kenneth kept telling Ms. Hunter that he knew what was wrong with him, that it was his appendix, that the nurses did not know what they were doing, and that the hospital should check him for his appendix instead of trying to stuff the tube down his throat. The only medical treatment that the nurses attempted on Kenneth Cook was to try to put the NG tube down his throat.
 "`At 6:05 p.m., Laurie Hunter had Kenneth Cook sign a form indicating that he was refusing medical treatment against medical advice. Ms. Hunter told Kenneth that "after signing out AMA ['against medical advice'], you understand you could die or something else could happen to you," which is what she tells all her patients. When Laurie Hunter had Kenneth Cook sign out, she did not tell Mr. Cook or his guard that he had high blood pressure, that his pulse was high, that his phosphate level was high, that his potassium level was high, that electrolyte results were still pending, nor did she inform Mr. Cook that he had ketoacidosis, a life threatening condition. In fact, no instructions whatsoever were given to Cook, his guard, or the Walker County Jail before or after they went back to the jail.
 "`Cook's electrolyte results were reported at 6:07 p.m. over the computer. The results revealed that the BUN was a little elevated at 26, the upper limit of normal is 23. The potassium was markedly elevated at 7.2, with an upper limit of normal being 5.3. The result was highlighted with the words "PANIC VALUES EXCEEDED" in bold capital letters. The chloride was normal at 101. The carbon dioxide content was 7, which is low, with the minimum normal value being 23. This result was highlighted with the words "PANIC VALUES EXCEEDED" in bold capital letters. The glucose was markedly elevated at 599, with an upper limit of normal of 106. This result was highlighted with the words "PANIC VALUES EXCEEDED" in bold capital letters. The creatinine, which is another measurement of renal function, was elevated at 2.6, with a normal upper limit of 1.4. Kenneth Cook's electrolyte results showed that he had diabetic ketoacidosis, which cannot be diagnosed without the electrolyte test. The electrolytes were at panic levels because they showed that Kenneth Cook would be a dead man if he was not treated for the ketoacidosis.
 "`According to the hospital's policy and procedure manual, whenever lab results indicate that panic values have been exceeded, the lab department is required to immediately phone the results to the charge nurse. The policy and procedure manual requires that the panic values are to be then reported to the attending/on call or consulting physician immediately. In addition, the lab department is required to send the panic level results through the computer system and the results are printed out in *Page 1075 
the emergency room. Then, either a nurse or the DTO will pull off the results and write them on the front page of the chart. Normally, it is the DTO's responsibility to receive the results.
 "`Unlike the other test results, the electrolytes results were never written down on the front page of Kenneth Cook's medical chart. When the panic level results came out over the computer at 6:07, Ms. Hunter was filling out her discharge paperwork on Kenneth Cook, because at 6:10 p.m., she noted on his medical chart that he had signed out and that she had been unable to put the NG tube down. After Hunter finished her paperwork concerning Cook, she gave his medical records to the DTO, Rochelle Harris, for billing purposes. Ms. Harris testified that she recalled logging in the billing information concerning Cook, but she does not recall what she did with Cook's file after she logged in the information. Normally, after she logs in a patient's billing information, she takes the patient's medical chart to out-patient registration. Harris did log in the billing information because bills were issued concerning Kenneth Cook.
 "`Laurie Hunter testified that once a patient is discharged, such as Kenneth Cook, the patient is no longer the hospital's responsibility, and there is no need to report panic levels. Hence, after Ms. Hunter completed Cook's medical chart, she never bothered to check to see if the remaining of the electrolytes, PT and PTT results had come back. In fact, no one at the hospital bothered to check on Cook's results nor did anyone ever tell the doctor that the results were still pending. No one bothered to tell the doctor, Kenneth Cook, or his jailer that the tests were still pending, nor did anyone ever tell the doctor, Cook, or his jailer the panic level results. Kenneth Cook was then brought back to the Walker County Jail.
"`Kenneth Cook died on May 10, 1994.'"
791 So.2d at 939-41 (emphasis in original).
Although certain of those facts were put in a different light by additional facts presented during the subsequent trial of this case, the recitation of those facts from Lyons I is important to provide the context in which this Court made its rulings in Lyons, and as a reasonably reliable, albeit incomplete, summary of the underlying events.
On remand, a six-day jury trial was conducted, resulting in a verdict for Walker Regional and Hunter. Lyons filed a timely motion for a new trial or, in the alternative, for a judgment as a matter of law, which the trial judge denied on February 19, 2002. Lyons appealed.
Lyons presents the following five issues for appellate review:
 "I. The trial court erred in allowing the defendants to put in the same old evidence and then argue contributory negligence and assumption of risk. Moreover, the trial court erred in instructing the jury on these two affirmative defenses.
 "II. The trial court erred in holding that contributory negligence can legally apply to this medical malpractice case.
 "III. The trial court erred in refusing to instruct the jury that wantonness and/or willfulness by the defendants negate the defendants' contributory negligence and assumption of risk defenses.
 "IV. The trial court erred in refusing to instruct the jury on subsequent negligence as part of the plaintiff's response to the defendants' defenses.
 "V. The trial court erred in refusing to grant [Lyons's] `Motion for a Directed Verdict' and her `Motion for New Trial, *Page 1076 
or in the Alternative, Judgment Notwithstanding the Verdict' as to the defendants' liability."[1]
We consider those issues in the order Lyons has presented them.
 I. and II.
"The trial court erred in allowing the defendants to put in the sameold evidence and then argue contributory negligence and assumption ofrisk. Moreover, the trial court erred in instructing the jury on thesetwo affirmative defenses." and "The trial court erred in holding thatcontributory negligence can legally apply to this medical malpracticecase."
In her argument directed to the first sentence of Issue I, Lyons asserts "[t]his Court's opinion [in Lyons I] and the evidence show that the defendants' affirmative defenses of contributory-negligence and assumption of risk are not applicable to this case." Consequently, she continues, "the defendants should have been precluded from arguing or mentioning contributory negligence and assumption of risk," and the trial court therefore "erred in instructing the jury on these two affirmative defenses." Lyons argues, in essence, that the doctrine of "law of the case" should have operated to preclude any further assertion of those defenses in the case, absent "new evidence."
In assessing Lyons's argument, it is important to remember that the question before the Court in Lyons I with regard to the defense of contributory negligence (the defense of assumption of risk was not separately acknowledged or discussed in that opinion) was whether each of the elements of that affirmative defense had been established by undisputed facts, or whether, to the contrary, a genuine issue of material fact existed with respect to one or more or those elements. The actual ruling of the Court in that regard was as follows:
 "The burden was on the defendants to make a prima facie showing, by substantial evidence, that no genuine issue of material fact existed. They did not carry their burden. Consequently, we reverse the summary judgment entered in favor of Walker Regional and Hunter and remand this case for proceedings consistent with this opinion."
791 So.2d at 944-45.
In coming to that conclusion, this Court considered the following:
 "The record shows that Cook was never informed of his life-threatening condition. It is questionable whether a blanket statement that `you could die' would have been enough to make him appreciate the danger of his condition, which even the defendants were unaware of until the laboratory results came back. Furthermore, Cook's cellmate testified by affidavit, in part, as follows:
 "`[Cook] told me that a nurse was trying to stick tubes in his nose and that it put him in a lot of pain. He said that when he complained to her, she told him he was refusing treatment. Soon afterward, he said they released him from the hospital.'
 "His cellmate testified further that Cook tried to return to the hospital after the initial visit. Thus, the record does not support a summary judgment based on a contributory-negligence defense."
791 So.2d at 944.
The only issue concerning contributory negligence in Lyons I was whether a genuine issue of material fact existed as to any of the essential elements of that defense. *Page 1077 
This Court concluded that it was "questionable" whether the blanket statement "you could die" would have been enough to make Cook appreciate the danger of his condition. 791 So.2d at 944. The only explanation of the content of that "blanket statement" in the opinion was in the trial court's recitation of the "undisputed facts": that Hunter told Cook "`that "after signing out AMA ['against medical advice'], you understand you could die or something else could happen to you," which is what she tells all her patients,'" and that "`no instructions whatsoever were given to Cook, his guard, or the Walker County Jail before or after they went back to the jail.'" 791 So.2d at 940-41.
"It is well established that on remand the issues decided by an appellate court become the `law of the case,' and that the trial court must comply with the appellate court's mandate." Gray v. Reynolds,553 So.2d 79, 81 (Ala. 1989). If, however, an observation by the appellate court concerning an issue is premised on a particular set of facts, and the nature of the remand is such that it is permissible and appropriate to consider additional facts relevant to the issue, the law-of-the-case doctrine is inapplicable. Quimby v. Memorial Parks,Inc., 835 So.2d 134 (Ala. 2002); United States Fid. Guar. Co. v.Baldwin County Home Builders Ass'n, 823 So.2d 637 (Ala. 2001); Blumbergv. Touche Ross Co., 514 So.2d 922 (Ala. 1987); Gonzalez v. BlueCross Blue Shield of Alabama, 760 So.2d 878 (Ala.Civ.App. 2000).
The certificate of judgment sent by this Court to the trial court advising of the reversal of its judgment in Lyons I explained that the case was being "remanded to the court below for further proceedings therein." Pursuant to that mandate, the trial now under review took place.
The considerations that should attend a trial judge's determination of whether contributory negligence has been established as a matter of law so as to entitle a defendant to a summary judgment and the considerations a jury should be instructed to apply in determining whether contributory negligence has been proven at trial are different, as discussed in Hannahv. Gregg, Bland Berry, Inc., 840 So.2d 839 (Ala. 2002). However, the parties do not discuss that distinction in their briefs, and properly so, given that the trial court's charge to the jury to the contrary concerning the elements of contributory negligence and assumption of the risk was never objected to by either side on the basis of any such distinction.
It is well established that neither the trial court nor this Court may undertake credibility assessments in reviewing testimonial evidence submitted in favor of, and in opposition to, a motion for a summary judgment, whereas making such credibility assessments is one of the key functions of the trial jury. See, e.g., Scott v. Farnell, 775 So.2d 789,793 (Ala. 2000), and Camp v. Yeager, 601 So.2d 924, 929 (Ala. 1992). Consequently, during the trial following remand, the jury was authorized to assess the credibility of the testimony of the various witnesses who appeared "live" before it, and accord such weight to their respective testimony as it deemed to be warranted, under a jury instruction the trial judge gave to that effect. Accordingly, when this Court made its observation in Lyons I that it was "questionable" whether the blanket statement "you could die" would have caused Cook to appreciate the danger of his condition, the Court was speaking in the context of a summary-judgment record. Based on that record, the Court concluded only that, given that Cook's appreciation of his danger was "questionable" and that he had been *Page 1078 
"released" from the hospital for allegedly "refusing treatment" onlybecause he had complained of pain when "a nurse was trying to stick tubes in his nose," a genuine issue of material fact existed as to some of the elements of the defense of contributory negligence. At trial, however, Walker Regional and Hunter were entitled to adduce additional, "new" evidence with regard to the defenses of contributory negligence and assumption of the risk in an attempt to show that other relevant information and warnings were given to Cook before he signed out against medical advice, as opposed to only the blanket statement that he "could die or something else could happen to [him]." 791 So.2d at 940.
Accordingly, we first review the trial record to determine if, as Lyons asserts, the "same old evidence" summarized in Lyons was presented to the jury, or whether additional relevant evidence was introduced. Because the timing, content, and emphasis of what Hunter told Cook is so important in this regard, we elect not to try to paraphrase or simply summarize it, but rather set out verbatim the testimony of the various witnesses in the order they testified as follows:
Testimony of Debbie ("Deb") Evans (a registered nurse working in Walker Regional's emergency department):
 "A. He's alert and quite able to tell me what's wrong with him."
 "Q. . . . Did you have any involvement yourself in any efforts either to actually put the tube into Kenneth Cook, or if not put a tube into him, discuss with him having the tube put in him?
 "A. Not that I remember trying to put the tube down or anything.
". . . .
 "Q, The next time you had any contact with it is when I think you said earlier that you were asked to be a witness to the reading of the AMA [against medical advice] and the discussion of the AMA form; is that right?
"A. Yes. Going by the chart, yes.
 "Q. Okay. And I know you say `going by the chart,' but I want to ask it this way: Do you have any independent recollection of what went on when the AMA form was being signed?
 "A. No. Just him being very determined, upset, wanting to leave.
"Q. Upset is a good word.
 "A. There was no — you couldn't — there was no trying to get him to understand or talk to him."
 "Q. Well, in point of fact, to your knowledge the only thing he refused was the NG tube?
 "A. He refused all treatment. At that point in time, he refused any and all treatment. He didn't want anything else done."
"A. He was very upset, agitated, angry, belligerent.
". . . .
"Q. Did he us profanity?
"A. Yes. He was determined to leave.
"Q. All right.
"A. He was just — he was just very ugly, upset.
 "Q. Did he appear out of his head or disoriented or anything like that?
"A. No.
 "Q. Okay. And when you got there, you said he was using profanity and belligerent. I don't want you to use the profanity, but what was his complaint or problem *Page 1079 
when you got there as best you recall?
 "A. Best I can recall is he felt like he was being mistreated, he — because he was a prisoner, and he was wanting to leave, he wanted out of there.
"Q. Okay.
"A. He said, `I want out of here.'"
 "Q. All right. When you got there, what was [Hunter] saying, if you can recall anything, to Mr. Cook?
 "A. Not word for word, but she was trying to talk him into staying —
"Q. Okay.
 "A. — trying to, you know, telling him to stay and let us finish evaluating you.
". . . .
 "A. He just — he said he did not want any more treatment. He told the officers to let him loose.
"Q. He didn't just say the NG tube, correct?
"A. No."
 "Q. What, if you recall, does [Hunter] do after he signs out?
 "A. She follows him to the door with a — he's leaving with an officer.
"Q. She follows him to the door?
 "A. Yes. She's attempting — still talking him into staying.
 "Q. All right. And has he said anything differently that indicated to you that he changed his mind about staying?
"A. No, no."
Testimony of Hunter:
 "A. Well, Deb Evans came to the desk and told me that Dr. — there was a man who said he was spitting up blood and that Dr. Boone told her to put an NG tube down and that he wouldn't let her to do it. And she asked me if I would come in there and see if he would let me do it.
 "Q. Well, let's back up just a minute. Have you ever testified that she had actually attempted to put it down and couldn't do it?
"A. I don't know —
"Q. Did you testify to that?
 "A. — that she actually attempted to put it down or not. All I know is that he wouldn't let her. Whether she actually tried to put it down or not, I don't know.
 "Q. Well, if it is a fact, you can't say one way or another whether — let me term it this way. Did you ever stick the tube up into his nose yourself?
"A. Yes, sir, I did.
"Q. And how far did you get it before he stopped you?
 "A. Just guessing, maybe two or three inches, not very far.
"Q. He complained that it was hurting him?
"A. No, sir. He just pushed my hands away."
 "A. After he pushed my hands away, I was in the process of explaining to him why he needed the tube, that it was very important. He said he had been spitting up blood and we needed to see if he was still bleeding from his stomach.
 "During this time he says, `That's not what's wrong with me, it's my appendix. I know what's wrong with me, it's my appendix.' At that time the guard said something to the effect, `Now, Kenneth, you know you said you were spitting up blood, and even other inmates said they'd seen you spitting up blood, and you need to let these people treat you.' *Page 1080 
And that is when really it clued that I would say he become adamant and really belligerent and he said, `I don't have to do anything. I want to leave. I don't want to be here.' He used — he just basically, `Take me back to the jail. I want to go back to the jail, I don't want any treatment.'
 "During this, I was trying to say, `Look, come on, let us treat you,' and he continued to refuse treatment. When he did that, I went to the doctor. I explained to the doctor that Kenneth was refusing the NG tube and that he didn't want any other treatment. Dr. Boone told me to quit and if he wanted to leave, sign him out AMA [against medical advice]. I went and got a form. I went back to the room, and again I tried to get Kenneth to let us treat him. I said, `You don't have to have the tube. Just stay here and let us treat you, you know. Maybe there's something else we can do for you.' He continued to refuse treatment.
 "I explained the process to him of what it means to sign out against medical advice. Basically, that is, `Look you understand that by signing this form and by saying you don't want any further treatment, that we don't know what's wrong with you and that you could die. You could bleed to death, you could have a heart attack, you could have a stroke, we don't know. And by you signing this you understand that and you're releasing responsibility.'
 "I said, `You need to read this form and sign it,' and that's when he told me he couldn't read or write. I read the form to him. Once I read the form to him, I handed it to him, he made an `x' on it and I told him, I said, `Now, look, just because you sign this form doesn't mean if you change your mind and want to come back for treatment, doesn't mean that you can't come back.' And I told him, `If you change your mind or get worse, to come back,' and I also said that to the deputy, `if he changes his mind or gets worse, bring him back.'"
"Q. . . . — did he use any profanity?
 "A. Yes sir. He used the `F' word. He wasn't going to stay in this `F-ing' place. We didn't know what the `F' we were doing. He said during this time he said he had rights, that he knew his `F-ing' rights and that we couldn't keep him there."
 "A. Well, he — discontinued. He stopped the patient/nurse relationship.
"Q. Right.
"A. He said he no longer wanted treatment."
Testimony of Rochelle Harris (the data terminal operator on duty starting at 6:00 p.m. on the day Kenneth Cook was treated):
 "Q. What did you observe about Kenneth Cook when you saw him?
"A. Where did I see him?
"Q. Uh-huh.
"A. Lying in the bed.
"Q. Did he have any shackles on?
"A. At that time, I did not notice.
 "Q. All right. What else did you observe about Kenneth Cook when you saw him lying on the bed?
"A. That he wasn't very happy.
"Q. How do you know he wasn't very happy?
"A. By the tone of his voice.
"Q. All right. What was he saying and what was his tone. *Page 1081 
 "A. To the best of knowledge, not word for word, he was very upset. He was using profanity.
"Q. What was he upset about?
 "A. Upset — the fact that he did not want to be treated.
"Q. What did he say?
 "A. Not word for word, basically that he had rights, even as a prisoner. That he would call his attorney. And we didn't have the right to do things like that and he knew his rights. Just because he was a prisoner, he should not be treated any differently.
"Q. To do things like what?
"A. Excuse me?
"Q. He said he had rights not to be?
 "A. Treated. If he did not want to be treated, he had the right to say he did not want to be treated.
". . . .
"Q. Well, did you hear him say anything else?
"A. Yes.
"Q. What did he say?
 "A. I want to go back to jail. Not word for word, but he did mention, I want to go back to jail.
"Q. Did you hear him say anything else?
"A. Quite a bit of profanity.
"Q. What kind of profanity was he using?
 "A. The type — would you like me to say the words that he was using?
"Q. (Counsel nods head.)
"A. This `F' — well, say the words?
 "Q. Well, at least, could you say — did he say the `F' word?
 "A. Yes. `This "F'ing" place don't have the right to hold me just because I'm a prisoner. I have rights just like everybody else.'
"Q. Any other profanity?
"A. Uh-huh (Witness nods head.)
". . . .
 "Q. You don't have to say the words. I mean you can say the `F' word.
 "A. Okay. Well, `This "F'ing" place doesn't have the right' — this is not word for word, these are some of the words that he used. And I'm paraphrasing what I've heard him say. `This "F'ing" place doesn't have the right to hold me. This place is a piece of "S." I don't have to stay here, I have rights. I will contact my lawyer because you mother "F's" will not treat me this way. I don't have to do anything. I can go back to jail. I want to go back to jail, you mother "F's."'"
 "Q. . . . Did [Hunter] read this AMA [against-medical-advice] form to Kenneth Cook?
"A. Yes, she did.
"Q. Did she read it word for word?
"A. Word for word.
"Q. What else did she say or do at this point?
 "A. Before she was reading the AMA form or after she was reading the AMA form?
 "Q. Before she read the AMA form, she tried a second time to place the tube down, correct?
 "A. Not necessarily place the tube down, but just to have treatment. She didn't say `I want to put the tube down.'"
 "A. I don't know if she did anything else, but after she read the form she asked him if he understood.
"Q. And what did he say?
"A. Yes." *Page 1082 
The against-medical-advice form, which Hunter indisputably read to Cook verbatim, stated:
 "PATIENT'S REFUSAL OF MEDICAL SCREENING AND/OR TREATMENT "I, Cook, Kenneth, have been informed that Walker Regional Medical Center has an obligation to examine and treat emergency medical conditions and women in active labor. I am refusing medical screening and/or treatment necessary to stabilize my condition. I understand that a medical screening is necessary in order for the hospital and physician to determine if I have a medical emergency. I understand that the hospital and/or physician are obligated to treat/stabilize emergency conditions and active labor, but I am refusing such care and thereby release anyone in connection with my care from any injury or harm that may result from my decision. I have been fully informed of the risks associated with my decision."
(Emphasis in original.)
The affidavit testimony of Cook's cellmate considered important inLyons I was not presented to the jury. Rather, Lyons expressly elected to forgo calling the cellmate to the stand even though he was available, because "the jailer put into the record that he was aware of the fact that Cook wanted to return [to the hospital] and that he claimed that he was sick and they didn't let him." The jailer, Deputy Sheriff Hayron Bridges, who had escorted Cook to and from the hospital, could not recall anything at trial about the cellmate's conversation referenced in LyonsI, but acknowledged that if in his deposition he had said that a trusty, Timothy Smith, had told him after Cook had returned from the hospital that Cook was sick and that he needed to go to the doctor, he was sure that that was correct. He went on to explain, however:
 "That could have been five minutes after I brought him back. You know, the trusties are bad about that. They stick their nose in everything and that was — Timothy Smith was a trusty and if he come to the window and told me that, it could have been five minutes after I brought him back."
The omission from the evidence at trial of the rest of the cellmate's testimony specifically cited in Lyons I would represent a different state of the record.
We conclude that, whatever weight the trial court might have accorded the aforementioned comments in Lyons I, there was in fact new evidence presented at trial relevant to the issues of contributory negligence and assumption of risk that went well beyond that relied on in Lyons I. Lyons argues that "none of this is new evidence and it is extremely doubtful based on other witnesses' testimony that Hunter told Kenneth Cook anything other than a blanket statement that you could die." (Lyons's brief, p. 39.) However, as noted, it was the province of the jury to make credibility assessments and otherwise to weigh conflicting testimony, and Lyons does not explain what "other witnesses' testimony" she has in mind. As noted, when we compare the facts mentioned in Lyons I with the portions of the trial record excerpted above, we respectfully disagree that no "new evidence" was presented.
The proposition asserted by the second sentence of Issue I — that the trial court erred in instructing the jury on contributory negligence and assumption of the risk — can appropriately be considered in combination with the proposition in Issue II that "[t]he trial court erred in holding that *Page 1083 
contributory negligence can legally apply to this medical malpractice case."
The trial judge instructed the jury as follows concerning contributory negligence and assumption of the risk:
 "I'm now telling you that the defendants have the burden of proof to convince the jury, to reasonably satisfy you by the evidence of the truthfulness of the claim of affirmative defense; that is contributory negligence and assumption of the risk. I'm going to define those for you and tell you what the elements are.
 "First, let me tell you what negligence itself is. Negligence is the failure to discharge or perform a legal duty owed to another party. Negligence means the failure to exercise reasonable and ordinary care; that is, such care as a reasonably prudent person would have exercised under the same or similar circumstances. Therefore negligence is the failure to do what a reasonably prudent person would do under the same or similar circumstances, or the doing of something which a reasonably prudent person would not do under the same or similar circumstances. So, therefore, contributory negligence is negligence on the part of the plaintiff that proximately contributed to his death.
 "Now, if you're reasonably satisfied from the evidence that the plaintiff was guilty of contributory — that is Mr. Cook, was guilty of contributory negligence, the plaintiff cannot recover for the initial simple negligence of the defendants. In considering whether he was negligent himself, there are three elements essential to assumption of the risk or contributory negligence in cases of this kind. First, is that the party charged with assumption of risk or contributory negligence, number one, had knowledge of the existence of the dangerous condition; and two, with appreciation of that danger; thirdly, failed to exercise care for his own safety by putting himself in the way of the danger."
At the close of all of the evidence, Lyons moved for a "directed verdict" (a judgment as a matter of law) on the issues of contributory negligence and assumption of the risk, on the ground that the opinion inLyons I had eliminated those defenses from the case. The trial judge denied the motion, noting that the Lyons I opinion "was based on the record before [the Supreme Court], and we have a new record here today" and that "contributory negligence is almost always a matter for the jury to decide." In the course of those discussions, counsel for both sides agreed that the pattern charge number 30.05, Alabama Pattern JuryInstructions: Civil (2d ed. 1993),[2] which the definition of contributory negligence in Lyons I parallels, correctly listed the elements of both contributory negligence and assumption of risk. Counsel for Lyons stated that APJI 30.05 was a "combined charge." After the judge gave that charge, Lyons objected, again stating that, after Lyons I, the defenses of contributory negligence and assumption of the risk were not "appropriate in this case," and also stating that, because contributory negligence has to be "in response to an underlying charge of negligence," it could have no field of reference in a *Page 1084 
medical-malpractice case, because such a case involved only the concept of "deviation from the standard of care." She later elaborated on that argument:
 "We further object on the basis that the Court in giving [an instruction on] contributory negligence and assumption of the risk also defined negligence, as it must if it gives that charge, but in a malpractice case there is no negligence. So what the jury was left with was some general charge of negligence, simple negligence, to which there has never been an allegation made against the defendants because we can't make such allegation. All we can make is a deviation from the standard of care in the national medical community.
 "And then in response to that the jury is given the charge that says but the defendants cannot be found responsible for any act of simple negligence. Of course, they never could be responsible for any act of simple negligence because that is not the law of the State of Alabama. The only thing they could be responsible for are acts of medical malpractice under the Alabama Medical Liability Act, so a jury gets to hear acts of simple negligence, which we could never charge them with, and it says we can be contributorily negligent but as to our contributory negligence if we are contributorily negligent, then we could not recover against the defendants for any acts of simple negligence."
When the jury subsequently sent out a note requesting that the trial judge "[r]estate the contributory negligence factors," he recharged them in essentially the same language he had used initially. Counsel for Lyons objected to the reprised charge, stating as grounds "the same ones" previously asserted.
Pertinent to Lyons's argument that she never alleged negligence in the case because "we can't make such an allegation" in a medical-malpractice case, we note that she alleged in both her original complaint and her amended complaint, on which she went to trial, that Walker Regional and Hunter's failure to provide Cook with proper care and treatment "constituted negligence and wantonness." She went on to assert that Walker Regional and Hunter "were negligent and/or wanton" in seven specified ways. She also sought punitive damages "because of the defendants' wanton conduct." Furthermore, at Lyons's request the trial court gave APJI 33.01, which reads:
 "COMBINED AND CONCURRENT CAUSES "If one is guilty of negligence which concurs or combines with negligence of another, and the two combine to produce (injury) or (damage), each negligent person is liable for the resulting (injury) or (damage) and the negligence of each will be deemed the proximate cause of the injury."
In arguing this issue on appeal, Lyons states that she "agrees that assumption of risk can apply to a medical malpractice, if there are facts to support such a defense [but that] contributory negligence cannot apply to a medical malpractice because it is designed to only apply to negligence causes of action." She cites no cases in support of her position, implied in her argument, that a medical-malpractice claim cannot be predicated on negligence, and, in fact, acknowledges that "[t]his Court has previously held that contributory negligence can apply to a medical malpractice. See Cackowski v. Wal-Mart Stores, Inc., 767 So.2d 319,330 (Ala. 2000)." Lyons's sole authority in support of Issue II is Dennisv. American Honda Motor Co., 585 So.2d 1336 (Ala. 1991). In Dennis, this Court held that, in an action brought *Page 1085 
under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") against the manufacturer of a motorcycle helmet the plaintiff was wearing at the time of a motorcycle accident, "[t]he defense of contributory negligence in an AEMLD action should be limited to assumption of risk and misuse of the product. The plaintiff's negligence relating to accident causation should not bar recovery." 585 So.2d at 1339. Lyons argues that, by analogy, to allow the defendants in this case to argue "contributory negligence as it relates to the causation in this case" is contrary to the public policy of protecting patients from medical malpractice. We fail to see the parallel, believing that a closer analogy would be if a defendant in a medical-malpractice action was charged with failure to diagnose a disease and attempted to defend on the basis that the patient had been contributorily negligent in contracting the disease.
This Court has frequently discussed medical-malpractice claims as involving negligence. See, e.g., McAfee v. Baptist Med. Ctr.,641 So.2d 265, 267 (Ala. 1994), and University of Alabama HealthServs. Found., P.C. v. Bush, 638 So.2d 794, 802 (Ala. 1994).
We find that the trial court did not err in charging the jury on contributory negligence and assumption of the risk over Lyons's objection.
Under the court's "combined" charge on contributory negligence and assumption of risk, the jury was to determine whether Cook knew of and had an appreciation for the dangerous condition, yet put himself in the way of it. As already noted, Hunter told Cook that he did not have to have the NG tube inserted and implored him: "Just stay here and let us treat you . . . . Maybe there's something else we can do for you." She explained to him that she did not know what was wrong with him and warned that if he left he could bleed to death or suffer a heart attack or a stroke. She emphasized that the medical personnel did not know what was wrong with him and that he could die from his condition if he left the hospital. According to Deb Evans, Hunter was "trying to talk him into staying . . . trying to, you know, telling him to stay and let us finish evaluating you." According to Evans, Cook "refused all treatment. At that point in time he refused any and all treatment. He didn't want anything else done." He rejected all treatment despite being read the against-medical-advice form, which advised him that in refusing treatment he did so with the understanding "that a medical screening is necessary in order for the hospital and physician to determine if I have a medical emergency." Cook belligerently and sometimes profanely insisted that he knew what was wrong with him and that it was his appendix; that he knew his rights and the hospital did not have the right to hold him against his will just because he was an inmate; that the hospital could not keep him there; that he did not "have to do anything"; that the hospital staff "didn't know what the `F' [they] were doing" and that the hospital was "a piece of `S'"; that he could go back to jail and, indeed, he stated: "I want to go back to jail, you mother `F's,'" and "Take me back to the jail. I want to go back to the jail. I don't want any treatment." According to Evans, Cook said that he did not want any more treatment. He told the officer to "let him loose." Despite Cook's intransigence and verbal abuse, Hunter continued to try to impress upon Cook the need to stay for a full evaluation. She also explained to him that even after he left, he could change his mind and come back, and similarly told the deputy, "if he changes his mind or gets worse, bring him back." *Page 1086 
There was ample opinion testimony before the jury, without objection, that Cook would have known from the duration and significance of his symptoms that he was sick and that his condition could be serious. Even Deb Calhoun, the nursing expert called by Lyons, testified as follows:
 "Q. [I]f you're throwing up for two weeks, you know you're sick, don't you.
"A. Yes, sir.
"Q. And he knew he was sick?
"A. I believe so.
"Q. Including blood out of his stomach, correct?
"A. Yes, sir.
"Q. His right side is hurting, he's in distress?
"A. Yes, sir.
"Q. And he knows it?
"A. I would think so, yes, sir.
 "Q. He just doesn't know why. He knows he's sick but he just doesn't know why.
"A. Right.
 "Q. He's seen by a doctor and at the time that Mr. Cook leaves against medical advice, the doctor doesn't know why, does he?
"A. No, sir.
". . . .
 "Q. And [Cook] obviously knew that when he left, his evaluation and treatment was not complete?
"A. I believe that he did.
 "Q. And he obviously knew he could die because [Hunter] made that very clear, didn't she?
"A. Yes, sir, I think she tried to.
 "Q. And in spite of all of that knowledge on his part, he left against medical advice, didn't he?
"A. Yes, sir.
"Q. Before the doctor could complete the evaluation?
"A. Yes, sir.
"Q. For his treatment?
"A. Yes, sir.
"Q. He shut it off prematurely, didn't he?
"A. He did."
The following exchange also took place between defense counsel and Calhoun:
 "Q. Now, another result of the patient leaving against medical advice, a patient like Mr. Cook in particular, `Is it that patient themselves, the patient themselves, or himself, places himself at great risk including the risk of death.'
"A. Yes, sir, that is the risk.
"Q. You've told us that then and you tell us that now?
"A. Yes, sir.
 "Q. And Mr. Cook did, in fact, place himself at risk of death when he left against medical advice on May 7, 1994?
"A. Yes, sir, he did.
"Q. And as a result he did die, didn't he?
"A. Yes, sir."
Also placed before the jury was the following testimony of Joy Morris, the defendants' nursing expert:
 "Q. . . . First of all, you understand [Cook] had made the decision to ask to be brought to the emergency department, correct?
"A. Yes.
"Q. From that we know he knew he was sick?
"A. Yes.
 "Q. He's the one who gave the history of throwing up, vomiting, for about two weeks, correct?
"A. Correct.
 "Q. Based on your experience as a nurse and taking care of people, if *Page 1087 
somebody presents with the history that they tell you they've been throwing up for two weeks, do they know they're sick?
"A. Yes.
"Q. You throw up one time, you know you're sick.
"A. Yes, sir.
 "Q. Not only throwing up, but throwing up blood; is the correct?
"A. Yes.
 "Q. Is that strong evidence of knowledge on his part that he was ill?
"A. Yes.
 "Q. He also knew that the doctor, after seeing him — of course, he was seen by a competent emergency room doctor; is that correct?
"A. From what I've read, yes, sir.
 "Q. Dr. Boone. The doctor, he knew that the doctor was concerned enough to order an NG tube for him?
"A. Yes, sir.
"Q. To rule out bleeding in the stomach?
"A. Yes, sir.
". . . .
 "Q. You know from your review of the case that [Hunter], in connection with her attempts to keep him there, told him a number of times `If you leave, you could die'?
"A. Yes, sir.
 "Q. As a nurse, is there any more strong warning that a nurse can give a patient trying to keep them from leaving AMA [against medical advice], that if you leave, you may die?
"A. That's as strong as it gets.
"Q. Do you know of anything stronger you could have said?
"A. No, sir.
"Q. So he knew that that morning at the time he left AMA?
"A. Yes, sir."
When Calhoun was asked if anything stronger could be said to a patient than if he did not allow medical personnel to care for him "you may die," she agreed, "No, sir, there isn't anything stronger that you could say." She also agreed that she could not have done any more than Hunter did, stating, "No, sir. There's no greater risk than death." Dr. Marshall Boone likewise agreed that if Hunter had told Cook that if he left before medical personnel had finished evaluating and treating him, "You could die," there was nothing more strong or more clear that could have been said to him at the time. He testified further that "I don't know anything more explicit that, you know, `We don't know what's wrong with you. If you leave here, you could die,' that's pretty explicit." He opined that "everybody understands the significance of hemorrhaging" and that Cook left knowing that Boone was "trying to rule out internal bleeding." Boone stated and explained:
 "My understanding of what Mr. Cook did was he refused treatment, which involved — part of that was the NG tube, but refusing, you know, refusing one aspect of treatment and leaving a facility is two different situations. And if a patient just refuses an aspect of treatment, the patient remains in the facility, the chart remains there and we can go forward with the diagnosis and treatment of the patient. On the other hand, if the patient leaves the facility, then that system breaks down."
Dr. Boone was of the opinion that Cook "voted with his feet" by walking out of the hospital, because "we can't keep people that want to leave." Finally, Dr. Boone testified as follows:
 "Q. What is the number one reason, based on your knowledge and your experience, that Mr. Cook died? *Page 1088 
"A. He refused medical treatment for his condition.
"Q. And left against medical advice?
"A. Yes.
 "Q. Is that the number one contributing factor to this man's death?
 "A. Yes, sir. I think — you know, unfortunately, we could speculate to doomsday that had he known the ketoacidosis instead of just knowing about the bleeding, maybe he would have stayed and had treatment, I think that's speculation.
 "But, you know, medical care, we have to have a relationship with the patient and we're there to help the patient. When I went to that emergency department that Saturday morning, I went to try to take care of the patients that presented to that facility that wanted to be treated. Patients who either didn't come in that day or left without being treated, I couldn't do that.
"Q. Is that because the patient ends the relationship?
"A. Absolutely."
The jury, in applying the court's charge on contributory negligence and assumption of risk to all of the testimony, could have concluded that Cook, with knowledge of the seriousness of his sickness and with the appreciation that it posed significant danger, including death, failed to exercise care for his own safety, by putting himself in the way of the danger about which he was warned, including death. Under the charge, the jury was not required to focus exclusively on the specific danger posed by the specific condition of diabetic ketoacidosis.
 III.
"The trial court erred in refusing to instruct the jury that wantonnessand/or willfulness by the defendants negate the defendants' contributorynegligence and assumption of risk defenses."
Although Lyons pleaded wantonness, she never requested the trial judge to charge the jury on it, and she never objected to the trial judge's failure to so instruct the jury. Her only citations to the record in connection with this issue are to pages where, at one point, she said concerning the jury instruction the court had given, "One other thing and I failed to mention it . . . I meant to also adopt the previous arguments made at the charging conference wherein I said that if the court does give contributory negligence, then we believe it must give the charge that says that contributory negligence would not be a defense to anywillful or intentional conduct . . . ." (Emphasis supplied.) Unfortunately, there is no record of the charging conference this statement references, or even confirmation that one was conducted. "The charge" referenced in the statement is nowhere identified. Throughout the portions of the record Lyons cites to in her brief on this issue she argued only with respect to the propositions of "willful or intentional conduct" (stated one time), "a willful act" (stated three times), and "willful and intentional conduct" (stated two times). She never used the term "wantonness" or any variation of it in those discussions with the trial court she cites. When, at a point in the record to which Lyons does not direct our attention, the trial judge recharged the jury on contributory negligence and assumption of risk, Lyons objected by stating only: "Your honor, the same ones that we've asserted with regard to the issues that we addressed previously, I would like to make a record with regard to the Court not further giving the charge having to do with intentional or willful conduct." After the jury had rendered its verdict and had been released, Lyons elaborated upon her objection, again referencing "willful and *Page 1089 
intentional" and "willful, intentional conduct," but for the first time alternatively referencing, without taking any special note of the change in wording, "willful and wanton or intentional conduct" and in one instance, "intentional, willful or wanton conduct." Her counsel explained at that time that when the judge had recharged the jury and then asked if counsel had any objections, counsel was hampered in making a full objection because of the presence of the jury. The trial judge responded that counsel could have asked that the jury be excused and that the judge would have excused the jury, but acknowledged that Lyons's desire to expand on her objection "was brought to our attention immediately after leaving the room," and it was agreed that "it would be done as soon as we come back."
This Court has explained the difference between wantonness, on the one hand, and "willful or intentional," on the other hand. See, e.g., Englishv. Jacobs, 263 Ala. 376, 82 So.2d 542 (1955), and Dickey v. Russell,268 Ala. 267, 105 So.2d 649 (1958). Lyons acknowledges the distinction in her brief to this Court, citing to Sellers v. Sexton, 576 So.2d 172, 175
(Ala. 1991). The two are different and distinct concepts, and willful and/or intentional conduct was nowhere pleaded by Lyons. As noted inDickey, supra, "a count alleging `willful and wanton' conduct requires proof of willfulness or design or purpose." 268 Ala. at 270,105 So.2d at 651.
Lyons cites Sims v. Crates, 789 So.2d 220 (Ala. 2000), as being "[a] case directly on point." In Sims, this Court reversed a judgment as to one defendant on account of the trial court's failure to explain in its jury charge on contributory negligence that contributory negligence was not a legal defense to a claim based on willful or wanton acts. We held that such a qualifying instruction should have been given "because whether [the defendant's] conduct was willful or wanton was an issue submitted to the jury." 789 So.2d at 226. In contrast, whether the defendants' conduct in this case was wanton (or willful) was not an issue submitted to the jury. Therefore, such a qualifying charge would have had no field of operation in this case, and Sims is thus clearly distinguishable. Whether the issue of wantonness (or willfulness, although not pleaded) should have been submitted to the jury is not an issue directly raised by Lyons. She does argue at points in her briefs to this Court that the defendants' conduct was such that they were guilty of wantonness (and "willfulness," and "willfulness and wantonness," and conduct "criminal and reprehensible to our society") but, as noted, she never requested the trial judge to charge the jury on any of those concepts and never objected to his failure to do so. Accordingly, we find no error on the part of the trial court as to Issue III.
 IV.
"The trial court erred in refusing to instruct the jury on subsequentnegligence as part of [Lyons's] response to the defendants' defenses."
Lyons asserts in her reply brief that she requested that the jury be instructed that subsequent negligence by the defendants "negates the defendants' contributory negligence and assumption of risk defenses." Her citations to the record in support of this contention reveal only that, after the court had initially charged the jury and asked Lyons for her objections to the charge, she stated, among other things:
 "The other thing that we object to, and these are some of the similar things that we discussed earlier, we believe that there was a claim of, in essence, subsequent negligence involved in this case. And the way that subsequent *Page 1090 
negligence — it wasn't defined as such. There were subsequent malpractice, let's put it that way, subsequent Alabama Medical Liability Action Responsibility. Is that — once whatever happens happened, the test was still in the hands of the defendant, and we had none of them, and then whatever we had done up to that point, the deviation from the standard of care in failing to provide us with that information in order for us to make an informed decision would have been in the nature of what once was referred to as subsequent negligence, and in this case I'm going to define it as subsequent violation of the Alabama — Alabama Medical Liability Act. And I think the — Justice England's opinion in [Lyons I] says it more eloquently than I could, herein he says, `A mere statement, "you could die," is not enough particularly in view of the fact that the test result, if you believe the evidence of the defendant of the hospital, the test result would have shown what we needed to know was not even available to the hospital until after we left the hospital.'"
Lyons then stated, "and if the court were to address any issues at all, there was one point . . . .," going on to discuss a separate issue. The court agreed that the issue specified was deserving of a supplemental instruction to the jury and subsequently gave one satisfactory to Lyons. No supplemental charge relating to "subsequent Alabama Medical Liability Action Responsibility" was submitted or requested by Lyons, and no ruling by the trial judge was otherwise invoked or made. For all that appears in the record, Lyons had not previously alerted the trial judge that subsequent negligence might be an issue in the case. Under all of these circumstances, we cannot find that the trial judge erred in failing to attempt to fashion, on its own, some supplemental charge articulating a proposition of "subsequent violation of the Alabama Medical Liability Act."
 V.
"The trial court erred in refusing to grant [Lyons's] `Motion for aDirected Verdict' and her `Motion for New Trial, or in the Alternative,Judgment Notwithstanding the Verdict' as to the defendants'liability."[3]
Lyons provides no citation to the record in either of her briefs to the trial court's refusal to grant her motion for a directed verdict. We do find in the record "Plaintiff's Motion for a Directed Verdict on the Defendants' Affirmative Defenses and Motion for a Directed Verdict as to
the Defendants' Liability" (emphasis added). As to the "affirmative defenses," the motion asserted the ground already addressed in this opinion — that Lyons I had eliminated the defenses of contributory negligence and assumption of risk. She also asserted that "the defendants have presented no evidence on their statute of limitations defense because there is none." That defense is nowhere mentioned in this appeal. As to the "liability" contention, the motion stated:
 "[T]he evidence in this case has shown that the hospital did not follow its procedures when the results of the electrolytes tests were not recorded on the front of Kenneth Cook's chart. Moreover, Dr. Boone's testimony has confirmed that these results were critical in assessing Cook's ailment. Hence, the plaintiff has presented a prima face [sic] case- in-chief, and she is entitled to a [judgment as a matter of law] against the defendants on liability."
At the conclusion of the evidentiary stage of the case, Lyons argued only that aspect of the motion relating to the affirmative *Page 1091 
defenses; she did not argue or otherwise specifically call the trial judge's attention to the "liability" aspect. Nonetheless, considering the "liability" ground properly before the trial court because it was contained in the written motion, we find no error in the denial of that aspect of the motion. The ground is premised on the proposition that the evidence showed "that the hospital did not follow its procedures when the results of the electrolytes tests were not recorded on the front of Kenneth Cook's chart." That same position is reiterated in Lyons's brief to this Court, where she again asserts only that the defendants "did not follow their procedures when the results of the electrolytes tests were not recorded on the front of Kenneth Cook's chart." That was indeed the understanding of the trial judge when he composed the memorandum opinion quoted at length in Lyons I, 791 So.2d at 941. Testimony at trial, however, contradicted the idea that Walker Regional had failed to follow its procedures when it failed to record Cook's electrolytes test results on the front of his chart. As noted in the trial judge's memorandum opinion, "Cook's electrolyte results were reported at 6:07 p.m. over the computer." 791 So.2d at 941. Rochelle Harris testified that lab results came into the emergency department over a computer "sitting right next to me." It was her responsibility as data terminal operator to copy the lab results from the computer printout onto the face sheet of the chart "in a timely manner." She did not know how to read or interpret the lab results; she just knew how to log them in on the chart. She denied that she had ever received Cook's electrolytes lab results or that she had seen them on the night in question. She had been scheduled to work from 7:00 p.m. on May 7, 1994, until 7:00 a.m. the following morning, but had come in a little before 6:00 p.m. because she had been called to come in early to fill in for the data terminal operator who had the shift before her, but who had called in sick. She does not know what time she might have finally gotten to her desk, located approximately 100 yards from where she clocked in. Hunter, for her part, testified that she did not see the results of the electrolytes tests when they came in over the computer because she had been with Cook in his room, and he had signed the against-medical-advice form at 6:05 p.m. She thereafter "came back to the desk, got the chart, made a note on it, and put it in the completed bin," "in another pile for Rochelle to do with it what she does with it, and I went on treating other people who were there who were needing my attention." The note she made on the chart, entered at 6:10 p.m., stated that Cook "signed out AMA (with form read to him)." The lab values were never reported to her.
Dr. Boone, Hunter, and Morris each testified that the hospital's policies and procedures relative to the reporting and charting of lab values, and "Panic Values" in particular, applied only for so long as the hospital-patient relationship continued and, as to a regularly discharged patient, with respect to any lab results reported after the discharge. Dr. Boone and Morris stated that when a patient leaves against medical advice, that departure is not considered a "discharge." Dr. Boone explained that when a patient leaves against medical advice, "the normal reporting process breaks down." He compared a patient's status to that of the engine on a train pulling cars; once the patient leaves against medical advice, "the engine jumps the track" and "the whole process breaks down, just like the engine leaving the track." Dr. Boone testified that once Cook left the hospital against medical advice he became a nonpatient, and Walker Regional's policies did not apply to him. Morris testified that hospitals and nurses have no ongoing duty of follow-up care, including reporting laboratory *Page 1092 
test results that were pending but not reported, once a patient signs out against medical advice. She agreed with Lyons's counsel on cross-examination that "the fundamental crux" of her testimony was that once a patient signs out against medical advice, Walker Regional and its staff have no further responsibility to that patient. Given this body of testimony, although there was testimony to the contrary from other witnesses, we cannot hold that the trial judge erred in refusing Lyons's motion for a judgment as a matter of law predicated on the ground that "the hospital did not follow its procedures when the results of the electrolytes tests were not recorded on the front of Kenneth Cook's chart."
 "`A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to [a] judgment as a matter of law.' Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 304 (Ala. 1997) (internal quotation marks omitted). '[I]n reviewing the record to determine whether a trial court properly [granted a judgment as a matter of law], we "must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would be free to draw." Renfro v. Georgia Power Co., 604 So.2d 408, 411 (Ala. 1992)' Gewin v. TCF Asset Mgmt. Corp., 668 So.2d 523, 526
(Ala. 1995)."
Vaughan v. Oliver, 822 So.2d 1163, 1168 (Ala. 2001).
With respect to the separate error on the part of the trial court alleged in Issue V — the court's refusing to grant Lyons's "Motion for New Trial, or in the Alternative, Judgment Notwithstanding the Verdict" — Lyons offers in her brief no argument or citation to the record. She does cite in the statement of the case in her brief those pages of the record where the motion is found. Consulting the motion, we conclude that all grounds asserted in it pertinent to the issues raised by Lyons in this appeal have already been addressed. The motion was denied by order dated February 19, 2002. If there was an actual hearing on the motion, no confirmation of that fact, or record of the hearing, appears in the record. We find no error in the denial of the motion.
 Conclusion
In reviewing the record of the tragic circumstances of Kenneth Cook's death, we do not sit as a superseding jury, free to decide the case de novo. Our role is limited to considering only the specific errors Lyons asserts on the part of the trial court. Any alleged error is eligible for our consideration only where an adverse ruling was made by the trial court and the error attending it was otherwise properly preserved at the trial court level and subsequently properly identified and argued to this Court. See, e.g., Rule 28(a)(3), (4), and (5), Ala.R.App.P. In accordance with these cardinal principles of appellate review, we have determined the scope of each issue presented on appeal by Lyons; have considered her citations to the record and to caselaw; have in the course of our review read the entire record and researched relevant caselaw; and have determined the nature of each ruling Lyons claims was error. We simply do not find error as to any of those rulings, as Lyons has stated her issues. We affirm.
AFFIRMED.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., concur.
[1] Rule 50, Ala.R.Civ.P., has renamed the "motion for a directed verdict" as a "motion for a judgment as a matter of law," and has renamed the "motion for a judgment notwithstanding the verdict" as a "renewed motion for a judgment as a matter of law."
[2] Alabama Pattern Jury Instructions: Civil 30.05 reads as follows:
"ASSUMPTION OF RISK — ELEMENTS
 "The three elements essential to assumption of risk (or contributory negligence) in cases of this kind are that the party charged with assumption of risk (or contributory negligence) (1) had knowledge of the existence of the dangerous condition and (2) with appreciation of such danger (3) failed to exercise care for his (her) own safety by putting himself (herself) in the way of such known danger."
[3] The proper terminology is a "motion for a judgment as a matter of law" and a "renewed motion for a judgment as a matter of law." Rule 50(a) and (b), Ala.R.Civ.P. See note 1. *Page 1093